## McNETT, Guardian, etc., *v.* COOPER and others.

*(Circuit Court, W. D. Michigan, S. D.* September 28, 1882.)

1. CONTRACT—MENTAL INCAPACITY—BURDEN OF PROOF.

The burden of proof is upon one alleging mental incapacity to make a valid contract, unless it is shown that the party contracting was insane *prior* to the date of the contract, when the burden is shifted, and those claiming under the contract must prove that it was executed during a lucid interval.

2. SAME—PARTIAL INSANITY.

Partial insanity, in the absence of fraud or imposition, will not avoid a contract unless it exists with reference to the subject of it at the time of its execution; but in cases of fraud it may be considered in determining whether a party has been imposed upon.

3. EXECUTED CONTRACT.

A contract becomes executed when nothing remains to be done by either party, and where the transaction has been completed, or was completed at the time the contract was made.

4. SAME—BILL DISMISSED FOR WANT OF EQUITY.

Where a mortgage was given to secure the purchase price of personal property sold by defendants to the mortgageors, who were at the time apparently, or supposed by defendants to be, of sound mind, and the contract has become executed by maturity of the debt, foreclosure and sale, and deeding of the premises, the court having no power to restore defendants to their condition before they parted with their property, a bill to have the mortgage and all proceedings taken to foreclose it, including the deed to defendants as purchasers at the foreclosure sale, declared void, will be dismissed for want of equity.

In Equity. Hearing on pleadings and proofs.

*J. L. Hawes* and *O. W. Powers*, for complainant.

*J. W. Breese* and *L. W. Wolcott*, for defendants.

WITHEY, D. J. The bill of complaint alleges that Charlotte E. Daly was insane in May, 1871,—not competent to enter into a binding contract; that she owned land in Kalamazoo county, Michigan, and then mortgaged it to defendants to secure the payment of promissory notes for $2,900, made by her and her husband to defendants for the purchase price of a steam saw-mill. The object of this suit is to have the mortgage, and all proceedings that have been taken to foreclose it, including the sale and master's deed, given to defendants as purchasers at a foreclosure sale, declared void. The mortgage was foreclosed in 1874; the sale under the decree was in November. Daly and wife were personally served, in the foreclosure suit, with subpoena, but failed to appear and defend. In January, 1875, McNett was appointed guardian of Mrs. Daly, on the application of her husband, by the probate court of Kalamazoo county. The answer denies the alleged insanity of Charlotte E. Daly, and all knowledge and information of any claim or pretense that she was insane at the time the mortgage was executed, or at any time anterior to the foreclosure of the mortgage. It alleges that James W. Daly, husband of Charlotte, purchased from defendants a steam saw-mill for the price of $2,900, about the time the mortgage was given, and that the sale to Daly was made upon the understanding and faith that he would secure the purchase price by a mortgage upon the land in question; that at the time of the arrangement and sale of the mill they supposed the title to the land was in James W. Daly, but proved to be in his wife. They would not have sold the mill to Daly on credit without security.

The burden of proof rests on complainant to show that Mrs. Daly was not competent, mentally, to bind herself by contract on the

eighteenth day of May, 1871. If once shown that she was generally insane prior to that date, the burden would be changed, and defendants be put to show that the mortgage was executed during a lucid interval. 4 Cow. 207; 1 T. B. Mon. 264. The witnesses who have testified are those who have known Mrs. Daly more or less intimately; two of her children, and two physicians who have been called to attend upon her or some of her family. Attention will be called to some of the testimony, which exhibits the character of evidence as to Mrs. Daly's mental condition. Mrs. Higgins, a neighbor, observed a change in Mrs. Daly's mental condition about 1866 or 1867. It took the form of melancholy—a disposition to be alone; talking to herself, and reluctance to talk with others. In 1877 Mrs. Daly grew worse, talked to herself much, and acted as if seeking to drive some invisible person or object away from her; would strike at and talk as if some person were present. Mrs. Higgins noticed more or less of the same peculiarities up to 1876. Mrs. Daly's two sons testify to much the same, and add that she poured water on her head and person frequently.

In 1869 Mrs. Daly was ill with malarial fever. One of the sons testifies that it lasted about three months, but the attending physician limits the period to less than two weeks. A sister-in-law, residing at Richland, about 10 miles from Kalamazoo, where the Dalys resided in 1869 and 1870 and a part of 1871, also subsequent to 1872, who frequently saw Mrs. Daly, never observed anything peculiar in her mental condition until the time of her fever, in 1869. Mrs. Daly was at one time a believer in spiritualism, so-called, and it was noticed that she muttered and talked to herself a good deal. Dr. Stillwell made professional calls at Mrs. Daly's in 1869, 1870, 1871, 1873, and 1874. He attended Mrs. Daly in 1869, during a severe attack of malarial fever, accompanied with congestive chills, and some mental disturbance. At the close of about two weeks she was recovered in bodily health, but the mental disturbance remained to some extent, though she was much improved in that respect. The doctor at first attributed Mrs. Daly's mental condition entirely to the severity of the fever. Having learned that she read and studied the subject of spiritualism, and had attended spiritual meetings, so called, he was of opinion that these things contributed to her mental disturbance.

Dr. Stillwell, in 1870, attended a sick child of Mrs. Daly's, and then observed that she muttered and talked to herself as she had done in 1869. He observed the same thing in the subsequent years that he

saw her, but noticed no other peculiarity to indicate mental derangement. On the occasion of his first visit to the child he prescribed a medicine, and gave the directions for administering it to Mrs. Daly, which she appeared to receive with proper understanding, and at his next visit was satisfied his directions had been followed, from the condition of the patient. Other testimony is of the same import as that referred to, to establish complainant's case.

On the other hand, it appears that Mrs. Daly was placed under no restraint by her husband or family, but permitted and was accustomed to go when and where she pleased alone and without supervision. She attended to her household affairs, was left in charge of the house and of her children in the absence of her husband, and attended to her own shopping. She appears to have been treated by her family as in every way competent to look after her household and family affairs, and whatever else concerned her. In the spring of 1871, about the time the mortgage was given, Daly moved with his family to Clyde, in an adjoining county, where he was engaged, with a person by the name of Mann, in the manufacture of lumber for more than a year. The business was carried on in the name of Daly & Mann, Mrs. Daly and not Mr. Daly being a member of the firm. Mann lived in the same house with the Dalys, who kept boarders. He says Mrs. Daly at times, when alone at her work, would laugh, talk, and use profane language,—the only peculiarity he noticed in reference to her. She had charge of the work in the house, and seems to have occupied herself with the duties of the household. The notary who took the acknowledgement of Mr. and Mrs. Daly to the execution of the mortgage visited Mrs. Daly for that purpose, at her home in Kalamazoo, and was there about 15 minutes. Saw nothing indicating any mental disturbance; she acted like a sane person.

General insanity has not been proved. If there was habitual derangement it was partial, and not shown to be of a character to affect Mrs. Daly's mental capacity to transact business understandingly. If her condition was otherwise it is not proved. Mrs. Daly exhibits partial mental derangement; more or less mental delusion, exhibiting itself under a single phase; hallucination on the subject of spiritual influences and manifestations. The degree of mental derangement which will render a person incapable of entering into a contract has been the subject of frequent judicial decisions. Contracts of *idiots, lunatics,* and persons *non compus* are invalid. In *Jackson* v. *King,* 4 Cow. 207, a leading American case, it was declared that a person is *non compus* only when he has wholly lost his understanding, for the

common law has drawn no line to show what degree of intellect is necessary to uphold a deed or contract. Mere weakness of understanding is not of itself any objection in law to the validity of a contract, in the absence of fraud. Other judgments state the rule in a somewhat modified form. The real inquiry is whether the party had the ability to comprehend, in a reasonable manner, the nature of the affair in which he participated. If fraud has been practiced on a person of weak or impaired intellect, the presence of fraud introduces other principles of decision. 23 N. J. Eq. 509. There must be inability to know what the act is to which the contract relates. 1 Whart. & S. Med. Jur. § 2.

So long as one possesses requisite mental faculties to transact rationally the ordinary affairs of life, his contracts will be valid. 84 Ill. 371; 40 Ill. 188; 52 Me. 305. He must have sufficient intellectual capacity to know what he is doing. It is not necessary to have sufficient discernment to transact business with prudence and discretion. A person must be able to understand what he is about. 25 N. Y. 1; 10 Ind. 185. Partial insanity will not avoid a contract unless it exists with reference to the subject of it, although it may be considered in determining whether the party has been imposed upon. 40 Iowa, 90; 6 Moore, P. C. 341; 73 Ill. 269; 58 Me. 453, 459. In the last case it is said hallucination is not *per se* insanity. It does not necessarily avoid a contract. It may exist as to matters in no way affecting the capacity to contract. Worcester adopts the medicinal definition of hallucination,—a morbid error in one or more senses, etc. "The party claiming to avoid a contract, by reason or temporary hallucination or delusion, must show its existence at the time of the contract sought to be avoided for such cause, and that it was of a character affecting his capacity to make the contract."

If the mind of Mrs. Daly was laboring under hallucination for years, or permanently, and if she was insane, it would be general of partial, according to the nature and extent of the malady. 58 Me. and 23 N. J. Eq. *supra;* 73 Ill. 269; Notes to *Jackson* v. *King,* 15 Am. Dec. 361, 364.

The mortgage has become an executed contract. A contract becomes an executed one when nothing remains to be done by either party, and where the transaction has been completed, or was completed at the time the contract was made. 1 Bouv. Law Dict. 356. The mortgage was given to secure the purchase price of personal property sold by defendants to Daly on credit, and upon the faith and understanding that payment was to be secured by this mortgage.

The debt has matured, the premises have been sold under a foreclosure decree, and deeded to defendants. The mortgage was made by persons apparently, or supposed by defendants to be, of sound mind. There is no power in the court to restore defendants to their condition before they parted with their property to Daly.

Let decree be entered dismissing the bill of complaint for want of equity, and for payment by complainant of the costs of the suit.